## JACKSON et ux. *v.* ALLEN.

1. Where one, acting as an agent in the purchase of a mine, took from the owners of the mine two bonds for title, one in the sum of $1,500 cash, and $4,000 to be paid out of the net proceeds of the mine, and the other in the sum of $4,000 cash and $4,000 out of the net proceeds of the mine, and concealed from his principal the first named bond, and represented that purchase had been made upon the terms of the last-mentioned bond, *held*, that such concealment and the procurement from the principal of the $4,000, as the cash payment, was a fraud upon the principal; and, *also*, that upon detection, the agent having agreed with the principal upon the amount due, for which the former gave his note to the latter, the court would not stop to inquire into the precise sum due, if the face of the note approximated such sum and the parties had settled upon that basis; and, *also*, that an assertion of the principal at the time of the execution and delivery of the note, that the agent was "liable to prosecution for fraud," was not sufficient upon which to base the defense of duress ; and where the agent subsequently acknowledged the validity of the note, by giving jointly with his wife their two notes, payable in one and two years, upon the surrender of the original, and there being, at the last transaction, no preponderance of evidence of duress, such defense could not prevail.

2. In a suit in chancery, where the evidence has been taken before a master, an appellate court will examine into the entire record, and affirm or reverse the decree of the court below, upon principles of equity, as the facts will justify.

3. The statute (R. S., p. 348, § 8) fixes the majority of a female at the age of eighteen years, and at that age she may execute a promissory note.

*Appeal from District Court of Arapahoe County.*

THE facts are sufficiently stated in the opinion.

Mr. S. P. ROSE and Mr. E. P. HARMAN, for appellants.

Messrs. WELLS, SMITH & MACON, for appellees.

THATCHER, C. J.  The bill in this case, which was dismissed in the court below, seeks to restrain the negotiation and prays for the cancellation of two certain promissory notes made by the complainants to the defendant.  The chief grounds relied upon are the alleged want of consideration, and that their execution was procured by fraud and duress practiced by the defendant.  There is no evidence tending to show,

however remotely, that Cora E. Jackson was coerced into the signing of the notes. At the request of her husband, she voluntarily joined in their execution. Mr. Jackson comes into a court of equity with unclean hands, convicted by his own evidence of a deliberate attempt to defraud the appellee. For the good name of Colorado it is to be earnestly hoped that an attempt to justify fraudulent practices by pleading the custom of the country will never receive the sanction of any of our judicial tribunals.

The appellee, and one George Allen, during a visit to Boulder in July, 1875, examined "Victoria Lode No. 2," and were well pleased with it. In an interview with Frank P. Jackson he proposed to the appellee and George Allen that they three should purchase the mine jointly. This proposition was acceded to. Upon the representation of Jackson that he could more advantageously negotiate the purchase of the mine, he was authorized to buy for their joint benefit at any sum not exceeding $4,500 in all, and not requiring a cash payment at the time of purchase exceeding $4,000. Jackson, for a purpose which subsequent events make plain, took two bonds for deeds from the owners of the mine, " one of said bonds (to follow the allegations of the bill) being for the sum of fifteen hundred dollars ($1,500) cash, and four thousand dollars to be paid out of the net proceeds of the mine, and the other calling for four thousand dollars ($4,000) cash, and four thousand dollars in the net proceeds of the mine." The *last-mentioned* bond was shown to George Allen secretly, and without the knowledge of either George Allen or appellee as to the price paid, the purchase had been made by Jackson on the basis named in the first bond, viz. : $1,500 cash in hand, and $4,000 additional to be paid out of net proceeds. Jackson drew a check for $4,000 on First National Bank of Denver, payable to the order of J. W. Corser (one of the mine owners) and to be charged to the account of Harrison Allen. This check was indorsed both by Corser and Jackson, and dated July 22, 1875. On presentation

the check was cashed by the bank out of the funds of appellee, and $1,500 of the amount were paid by Jackson to the owners of the mine, being the only cash payment required. Jackson had the deed of the entire mine made to himself, and he conveyed two-thirds thereof to the two Allens. Jackson concealed from appellee the fact that he had made a cash payment of only $1,500, and represented that he had no money with which to pay one-third of the total alleged consideration which appellee had advanced for his benefit, but that he expected to receive the money in a few days from Pittsburgh, Pa. He then gave his note to appellee payable in seven days for $1,333.33. August 2, 1875, Jackson made a payment on this note of $1,200, stating at the same time that he would pay the balance as soon as possible.

It is fairly deducible from the evidence that this payment was made out of his ill-gotten gains. Here was an evident attempt to defraud appellee out of $2,500. But Jackson alleges in his bill, and testifies at the hearing, that to enable him to consummate the purchase of the mine, it was necessary to call in one J. B. Shaw, a mining broker, to aid in the negotiations, and that he paid Shaw $500 for his services, for which he, Jackson, claims a credit. Shaw was not put upon the stand. If $500 were in fact paid him for his services in aiding to concoct, carry out, and conceal a perfidious scheme, the ultimate purpose of which was to defraud the appellee, we are aware of no principle of equity that will require the defrauded Allen to re-imburse Jackson the amount he paid out to his partner in guilt. If, as counsel for appellant contends, it be conceded that the employment of Shaw by Jackson was for a legitimate purpose, it does not appear that appellee had authorized such employment or the paying out of commissions, nor was the employment subsequently ratified. Indeed the evidence conclusively shows that the fact of such alleged employment was for about five months carefully concealed from appellee.

At the time the mine was bought the former owners agreed to sink the shaft twenty feet deeper than it then was, and to timber it, Jackson to furnish the lumber, and they further agreed to run a tunnel one hundred feet on the lode. For their work they were to receive $1,400. When the work was completed, Jackson paid the former owners of the mine $1,400, as per contract. Of this sum, on account of the development of the mine, and before Jackson's fraud was discovered, appellee paid by draft Aug. 26, 1875, $100, and by draft Sept. 29, 1875, $625.

Jackson claims a credit on account of services as superintendent of the mine. The evidence we think does not justify the claim. Appellee's testimony is to the effect that for his services as superintendent he was to receive $4 per day, payable out of the ore on the dump. Jackson testifies that he was to be paid for his services without regard to the value of the ore. McPherson testifies that he (Jackson) never superintended the work on the mine, "but was out prospecting and looking after a contract he had let on Standard lode." The evidence convincingly shows that Jackson hauled away and appropriated quantities of the best ore, of which he made no account or return.

Jackson alleges in his sworn bill, and testifies at the hearing, that for his one-third interest in the mine, he gave appellee his note for $1,200. He swears that nothing was said about the balance, $133.33, by appellee, and further, that he paid the whole amount due on the note about a week afterward.

Appellee's testimony is in direct conflict with Jackson's testimony on this point. Not only does appellee testify that the note was for $1,333.33, that but $1,200 had been paid on it and indorsed as a credit, but by the production of the note itself, the evidence of appellee is corroborated. That the court below did not give full credence to the evidence of Jackson, some parts of which were intrinsically improbable, and other parts of which were proved to be absolutely, and we think, willfully false, is no ground of

error.  To believe the evidence of Jackson upon any point, unless corroborated, is a tax upon human credulity.  It appears from his own testimony that both, by language and conduct, he uttered and acted falsehoods in all his transactions with appellee.  In addition to this, as we have before seen, the falsity of some of his testimony on material points at the hearing, was established by indubitable proof.

Appellee, having learned, Dec. 18, 1875, of one of the former owners of the mine, that but $1,500 cash had been paid therefor, confronted Jackson in his office at Denver two days later, and demanded an explanation.  Jackson confessed the fraud, but attempted to excuse himself by saying: "That's the way we do business here."  He further said he thought the mine would pay from the grass roots; that he aimed to get his interest free of cost; that he was hard up; that he wished first to get the $2,500 in his own hands, and that when the mine would pay, he would return it. After being detected he offered to make reparation as far as possible.  Appellee testified: "Jackson made his own figuring, and in adjusting the difference between us, in settlement of the work in the mine and the money wrongfully taken from me, said there was $2,000 in justice due me, and asked me to take his note, which proposition I accepted, and we then settled accounts.  I took his receipt in full and his note for $2,000, in six months, at eighteen per cent interest.  I told him he was liable to prosecution for fraud, but that I had no desire to prosecute or injure him — simply wanted my money."  This statement is substantially corroborated by Gaylord C. Allen who was present at the interview and settlement.  Considering the evidence adduced at the hearing as a whole, we cannot say that the *precise* sum then due was $2,000, but it approximated it, and the parties settled upon that basis.  Sufficient appears to show that the note was not without consideration, and although Jackson testified that the note was executed under threats of criminal prosecution, and without consideration, the preponderance of credible evidence, as we weigh it, does not support that

view. The reconveyance of one-third interest in the mine by Jackson to appellee, we are impelled to conclude was made as security for advances to be made by appellee in the future development of the mine, Jackson then being without funds to contribute for that purpose. In fulfillment of this agreement to advance funds, appellee has already expended between $800 and $900.

The validity of the $2,000 note Jackson subsequently acknowledged, and promised that the same should be paid when due. It certainly cannot be claimed that he was then under duress. Appellee having learned that Jackson, with a view to avoid the payment of the note, had transferred all his property to his wife, requested him to secure him. A check for $180, which had been given by Jackson to appellee on account of accrued interest, had been dishonored by the bank. There were then due on note and check $2,240. Appellee surrendered both note and check, and received in lieu thereof two notes executed by Jackson and wife, one for $1,000, due in one year, and one for $1,240, due in two years, with ten per cent interest per annum. As to whether, in this last transaction, threats of criminal prosecution were made, there is oath against oath, and even if Jackson was equally credible, under the ordinary rule, the burden of proof being with him, his case is not made out. In a chancery proceeding where the evidence has been taken by a master, an appellate court will not sustain the decree of the court below, merely on the ground that it is not unsupported by evidence; but will examine the entire record, sift all the evidence adduced with the view of arriving at the truth. We can only weigh the evidence. The witnesses neither appeared before the court below nor before this court. Their manner of testifying and their appearance upon the stand may be considered by a jury, or, when the trial is to the court, by the court. But here there was no such opportunity.

Carefully weighing all the evidence in the light of the rules laid down by the authorities for testing its value, we

are constrained to the conclusion that the decree of the court below is justified by the facts and founded upon principles of equity.

It is insisted, however, that as Cora E. Jackson was not twenty-one years of age when she signed the notes, that she was not bound thereby. Under our laws a female attains her majority at eighteen years of age. R. S., p. 348, § 8; *Stevenson* v. *Westfall*, 18 Ill. 209. This objection is, therefore, without force.

The decree of the district court is

*Affirmed.*