BATES ET AL. v. ALFRED H. AND RANDALL W. WILSON, AND THE WOODMAS OF ALSTON MINING CO.

1. A JOINT CONTRACT MAY EXIST FOR THE PURCHASE OF REAL ESTATE, BY VIRTUE OF WHICH A BENEFICIAL INTEREST WILL VEST IN ALL THE CONTRACTING PARTIES ON THE PURCHASE THEREOF, REGARDLESS OF PERFORMANCE ON THE PART OF EACH.— Three persons entered into a joint agreement to acquire title to certain unpatented lode mining claims, by the terms of which two of them, brothers, were to purchase of the holders thereof the possessory rights and titles by virtue of which they were held, and the *third* party was, at his expense, to perfect these titles, by foreclosure, and purchase thereof at the foreclosure sale, of a trust deed thereon, and by procuring United States patents for all the claims. All titles were to be taken in the names of the two brothers, to be held by them for the joint benefit of the three, and all expenditures were to be reimbursed to the parties out of the proceeds to be realized from working the property, first the two brothers the amount expended in purchase of the possessory titles, and then the *third* party the amount which he expended in perfecting the titles, after which the property was to be held and operated for the joint interest and benefit of all three parties. *Held*, that on purchase by the two brothers of the possessory titles a beneficial interest vested in the third party, the performance of the contract by him not being a condition precedent to his acquiring such interest.

2. TRUST ESTATE AND ADJUSTMENT OF THE RIGHTS OF THE BENEFICIARIES.— A purchase under such an agreement charges the property with a trust in favor of the third party which cannot be

arbitrarily discharged, but only by proceedings involving an accounting, settlement and adjustment of his rights in accordance with the terms of the contract.

3. WHAT IS SUFFICIENT TO CONSTITUTE A CORPORATION DE JURE.— A certificate of incorporation which provides that the corporate affairs shall be controlled by its president, vice-president and attorney, instead of providing for a board of directors or trustees, as required by General Statutes 1883, section 238, is insufficient to create a corporation *de jure*.

4. WHO IS ESTOPPED TO DENY DE FACTO EXISTENCE OF A CORPORATION DE JURE.— One who has signed such certificate, has conveyed property to the company, and has acted as one of its officers, is estopped from denying its *de facto* existence.

5. CERTIFICATE OF INCORPORATION — CONSTRUCTION OF AMBIGUOUS LANGUAGE.— Where three owners of mining property, each owning an undivided one-third interest, organize a corporation, and convey to it the said property in payment for all its stock, which, by the certificate of incorporation signed by the three, is to be " divided half and half between the parties," each incorporator is entitled to one-third of the capital stock.

*Appeal from District Court of El Paso County.*

Mr. L. C. ROCKWELL, for appellants.

Mr. HUGH BUTLER, for appellees.

PATTISON, C.   The judgment appealed from in this case was rendered June 26, 1886.   It was found by the court that " the equity of this case is not with the said plaintiffs, but is with the said defendants."   There was no other finding.   The decree, dismissing the bill, was predicated upon this finding alone.   To determine the appeal, therefore, a review of all the evidence is necessary.   The trial having been had entirely upon *depositions*, it is the duty of the court, not only to sift and weigh the testimony, but to consider the whole case, not only upon the law, but upon the facts as well.   *Jackson v. Allen*, 4 Colo. 263; *Miller v. Taylor*, 6 Colo. 41; *Sieber v. Frink*, 7 Colo. 148; *Bank v. Newton*, 13 Colo. 245.

There is a conflict of evidence upon all, or nearly all, the issues in the case.   A discussion of the testimony in

detail is impracticable. The entire record, however, has been rigidly examined, and the conclusions reached are the result of careful investigation and analysis.

The evidence tends to show that prior to November 1, 1884, George R. Gwynn and James Moynahan claimed to be the owners of eight certain lode mining claims, situate in the county of Park, which had been theretofore the property of the Great West Mining Company. The interest of Gwynn was an undivided two-thirds, and that of Moynahan an undivided one-third. They derived their title from sheriffs' deeds, issued to them as purchasers at execution sales, upon judgments recovered against the Great West Mining Company. No part of the property had been patented. The validity of the title was doubted, on account of the irregularities in the judgments.

The property was subject to a trust-deed, which had been made by the Great West Mining Company in April, 1882, to secure the payment of a promissory note given to one Duncan McBride, for the sum of $3,000, with interest at the rate of one and one-half per cent. per month. Two thousand dollars had been paid upon the note. The mining company was insolvent and could make no further payment. Prior to the month of October, 1884, this note and trust-deed had been placed in the hands of George C. Bates, one of the original plaintiffs in this case, for collection. Gwynn, through Bates, as the attorney for McBride, had agreed to purchase the note, and had employed him to institute suit in the federal court to foreclose the trust-deed. The purpose of the foreclosure was to perfect the title to the property.

In October Gwynn decided to sell the property. He claimed to represent his own interest and also that of Moynahan. He authorized Bates to negotiate a sale. The price and terms do not appear to have been definitely settled when the authority was given. Gwynn proposed to sell the entire property and any interest which he had

acquired in the McBride trust-deed and note by his arrangement with Bates. Pursuant to this authority, Bates, prior to November 1, 1884, brought the property to the attention of the defendants Alfred H. and Randall W. Wilson. They were engaged in business as grocers in this city. They became interested, and during November Alfred H. Wilson went to Park county to examine the property. After the examination they decided to take the property, if it could be purchased at a reasonable price. Before the purchase was made, negotiations were had between Bates and the defendants, for the purpose of making some arrangement or agreement under which Bates might also acquire some interest in the property. These negotiations resulted in a parol contract, by the terms of which Bates undertook to negotiate the purchase of the property upon the best terms possible. He also undertook to prosecute the suit brought to foreclose the McBride trust-deed to final judgment, at his own expense. He further agreed to pay the amount of the judgment and to purchase the property for the benefit of the parties at the sale to be had under the decree. He also agreed to apply for and obtain patents to the entire property at his own expense. He also undertook to render such legal services as might be required in the defense of the title, and to protect the interests of the parties. The Wilsons agreed that they would advance the money to pay for the property. It was further mutually agreed that, if the purchase should be made pursuant to the agreement, the title should be taken in the name of the defendants Alfred H. and Randall W. Wilson, to be held by them for the joint interest and benefit of the three; that from the proceeds of the property the amount advanced by the defendants to purchase the property should first be paid; the amount paid by Bates to perfect the title under the decree of foreclosure was next to be paid; the expenses incurred by him in obtaining the patents and reasonable compensation for

legal services should then be allowed; and thereafter the property should be worked for the joint interest and benefit of the three parties. After this arrangement was made, Bates transferred to his wife, Mary Barker Bates, one-half of the interest which he expected to acquire.

The negotiations for the property with Gwynn were had pursuant to this agreement. A contract for the purchase of his interest was made on or about the 5th day of December, 1884. Prior to that time, Moynahan had denied Gwynn's authority to represent him, and negotiations were had with him independently. By the terms of the contract with Gwynn the parties agreed to pay the sum of $6,194 for his interest in the property, and his right to purchase the McBride trust-deed; $2,000 of this sum was paid in cash, and the balance was to be paid forty-five days thereafter. Gwynn thereupon executed a deed conveying his interest in the property, which was placed in escrow in the First National Bank of Denver, to be delivered to Alfred H. Wilson and Randall W. Wilson upon the payment of the sum of $4,194, the balance of the purchase price. The interest of Moynahan was purchased on December 6, 1884, for the sum of $2,000. Five hundred dollars of this sum was to be paid on December 16, 1884; $1,000 on January 16, 1885; and the balance of $500 on February 3, 1885. Moynahan duly executed a deed to his interest upon December 6, 1884, which deed was placed in escrow in the Colorado National Bank, and there remained until the several sums mentioned were paid, when it was delivered to Alfred H. and Randall W. Wilson.

At the time this purchase was made the property was in the possession of a lessee. The lease was to expire at noon on December 8th. Gwynn agreed to deliver possession of the property to the Wilsons immediately upon the expiration of the lease, and entered into a contract with them to work the mines until they could take charge of the business themselves. By the terms of this agree-

ment he was to receive $5 per day for his services, and to account for the entire proceeds of the property. By these transactions the Wilsons acquired the legal title to the premises in question, and became entitled to the possession of the property on December 8, 1884.

December 8, 1884, Gwynn took possession of the property as the representative of the defendants. The mines were then very productive. Gwynn violated his contract in every particular. He began to work the property, but failed to account for the proceeds, and failed to keep the Wilsons advised of his operations. Early in January, 1885, Bates went east, and did not return until about the 1st of March. The balance of the purchase price was due to Gwynn on or about the 14th of January, 1885. Before that day arrived the Wilsons, believing that Gwynn, in violation of his contract, had taken from the property more than sufficient money to pay this balance, and in order to get time to investigate, obtained from Gwynn an extension of the time to March 3, 1885. The balance due to Moynahan was paid in accordance with the terms of the agreement with him. Bates being absent, nothing was done by the Wilsons to protect their rights as against Gwynn until his return. In the interval Gwynn actually realized from the property more than $20,000. When Bates returned, he determined to commence suit against Gwynn at once to recover this money. As a first step, however, it was thought necessary to obtain the deed, which was still in the First National Bank in escrow. A bill was filed in the district court of Arapahoe county, and an injunction obtained restraining Gwynn from working the property, and also enjoining the First National Bank from paying over to Gwynn the amount of money which was then deposited, for the purpose of obtaining possession of the deed. Gwynn appeared and answered the complaint, setting up as defenses that, by the failure of the Wilsons to pay the purchase price in accordance with the terms of the con-

tract, they had forfeited their interest in the property, and that the subsequent payment to the bank was not a good payment, because the bank was enjoined from paying the money over to him. This suit was settled by the practical surrender to Gwynn of all that he claimed.

Defendants insist that Bates was guilty of a violation of his agreement to defend the title to the property, and protect the interest of the Wilsons, because the compromise was made upon the unjust terms demanded by Gwynn. It is clear, however, from the evidence, that the Wilsons settled with full knowledge of their rights, believing that it would be best to obtain possession of the mine upon any terms rather than enter into protracted litigation. By the settlement they received one-third of the net proceeds which Gwynn realized from the mines; it being conceded that the one-third belonged to them, as owners of the Moynahan interest. This amounted to about $3,500. After this settlement, the parties acquired undisputed possession of the property, and immediately began the prosecution of the enterprise under their contract. Bates began to take the necessary steps to obtain patents for the property. He also continued the prosecution of the suit in equity brought to foreclose the McBride trust-deed.

Prior to April 1, 1885, after some discussion, the parties agreed to organize a body corporate for the purpose of conducting their common business. On or about April 7, 1885, a certificate of incorporation was prepared by Bates, which was executed by him and by the Wilsons upon that day. On account of the importance of this instrument as evidence, and the effect which it is claimed to have upon the rights of the parties, the material parts of the certificate are here stated in full: "*First.* The corporate name of said company is The Woodmas of Alston Mining Company. *Second.* The object of such corporation is the working, operating, buying and selling ore, and leasing mines of gold and silver, in Park and other counties, in

Colorado; buying, selling and smelting ore in all parts of Colorado; and doing a general mining business in said state. *Third.* The capital stock is $500,000, divided into fifty thousand shares, of $10 for each share, divided half and half between the parties. *Fourth.* The company shall exist for fifty years. *Fifth.* That the affairs and management of said corporation are to be under the control of Alfred H. Wilson, president, financial agent and treasurer; Randall W. Wilson, vice-president; and George C. Bates, attorney, secretary and accountant,— who are selected to act as such officers to manage the affairs and concerns of such corporation until May 1, 1886. *Sixth.* The operations of said corporation to be carried on in Park county. The principal place and business office is located at Alma, with a branch office in Denver. *Seventh.* The president, vice-president and attorney have power to make by-laws as they deem proper, and no stock shall be issued or delivered except by their joint action in writing." This certificate was duly executed, acknowledged, and filed in the office of the secretary of state, and a copy thereof in the office of the clerk and recorder of Park county. Upon the following day a deed was made and executed by the Wilsons, conveying to the body corporate the entire property acquired from Gwynn and Moynahan. The consideration expressed in the deed is $500,000. This sum represented the entire capital stock of the company. This deed was duly recorded. At the time the deed was made the corporation had not been organized.

After filing the certificate, and until the bringing of this suit, the business of these parties seems to have been conducted in the name of this corporation, to wit, The Woodmas of Alston Mining Company.

Bates spent a considerable portion of his time at Alma in the business of the company. He continued to take the steps deemed to be necessary by him to obtain patents for the property. It appears, however, that at about

this time the parties decided not to apply for patents until after the sale under the trust-deed. The mines were worked with varying success. Mary Barker Bates was recognized by the Wilsons as a party in interest. Bates appears to have taken several hundred dollars with the consent of the defendants.

In May, 1885, Bates obtained a decree of foreclosure of the McBride trust-deed. By this decree it was adjudged that there was due to McBride the sum of $1,916, and it was further adjudged that, if the defendant, the Great West Mining Company, should fail to pay this sum and costs of suit within thirty days from the date of decree, then the property should be sold. Under this decree the property was advertised to be sold at Alma upon the 15th day of August, 1885. William M. Burns, sheriff of that county, was appointed a special master in chancery to make the sale. The defendant Alfred H. Wilson and George C. Bates attended the sale. Prior to that time, no serious controversy appears to have arisen between the parties. It had been claimed by defendants that they had been misled in executing the articles of incorporation, with the clause therein declaring that the stock should be "divided half and half between the parties." They contended that Bates was to receive but one-third of the capital stock, and that his right to any interest therein was entirely dependent upon his performance of the contract entered into at the time the original purchase was made. It appears, however, that this controversy did not seriously interfere with the relations of the parties, and that they continued their operations together, the same after as before the misunderstanding arose. Upon the day of the sale Bates did not have the money to pay the amount of the decree. He therefore proposed to Wilson to bid for the property the amount found due by the court, in the name of his client Duncan McBride. His purpose seems to have been to bid in the property, and afterwards secure the certificate of pur-

chase from McBride, before the time to redeem had ex-
pired, for the benefit of the company.   He claimed that,
under his arrangement with McBride, he could control
the certificate.   Wilson objected to this course.   He pro-
posed to buy the property individually.   Bates would not
consent.   Finally it was agreed that Wilson should bid
as president of the Woodmas of Alston Mining Com-
pany, and buy the property for the company.

Before the sale took place it had been arranged be-
tween Wilson and the special master that the money
should be paid to him some day thereafter.   The sale
was made and the property was sold to the corporation
for the sum of $2,300.   After the sale, Wilson demanded
that Bates should provide the money to pay for the prop-
erty, as he had agreed to do under the contract.   This
he would not or could not do.   Wilson refused after-
wards to pay his bid.   In his testimony he states, as a
reason for his refusal, that he had become satisfied that
the trust-deed had been paid; that nothing was due
thereon; and that he desired an opportunity to investi-
gate.   After this attempted sale, the parties continued
the business of working the mines as before.   A resale
was ordered, which was advertised to take place upon
October 16th.   Bates and defendant Alfred H. Wilson,
accompanied by counsel, attended the second sale.   Bates
again proposed to bid off the property for the amount of
the decree, in the name of his client McBride.   To this
Wilson strenuously objected, and a serious controversy
arose between the parties.   They were not able to agree
as to the manner of conducting the sale.   When the
property was offered by the special master, Wilson bid
for the property the sum of $2,600.   He then demanded
that the master should immediately deliver to him a cer-
tificate of sale.   The master declined to do this until the
money had been paid to him, assigning, as a reason, that
Wilson had failed to complete his bid and pay the money
at the first sale.   As a result of this controversy, Wil-

son was permitted to withdraw his bid, and made a second bid, which was also withdrawn, because the master again refused to deliver the certificate until he had received the money. The property was again offered for sale, and was bid off by Wilson individually, and the money paid over. Bates violently objected to this course, and threatened to have the sale set aside, but upon what grounds it does not appear. Wilson was permitted to withdraw his money, and the property was thereupon again offered. Bates bid the amount of the decree in the name of McBride, and received the certificate of sale. This certificate was forwarded by Bates to his client. Whether any arrangement was made by him to pay to McBride the amount due him, and take the certificate before the time for redemption should expire, does not clearly appear.

Prior to the sale, a serious controversy had arisen between the parties. The defendants first insisted that the complainant Mary Barker Bates had no interest in the property, either as a stockholder or otherwise. They also claimed that Bates was without a present interest in the property, for the reason that his interest was conditional, and could not vest until he had performed his contract, obtained patents for the property, and provided for the payment of the McBride trust-deed. It appears that, at or about the time of the sale, the defendants had refused to permit Bates, or any one representing him, to enter upon the premises. Thereupon, and on the 17th of October, 1885, this suit was begun.

The action was originally brought by the complainants, as the owners of one-half of the capital stock of the company. Their claim to relief was entirely predicated upon their relations to the corporation as stockholders. They alleged that they were the owners of one-half of the capital stock; that the defendants denied their interest, and interfered with the exercise of their rights. They prayed for an injunction, for the appointment of a

receiver, and for other relief.   A writ of injunction was
issued at the time the bill was filed, and afterwards, upon
motion, Nathan S. Hurd was appointed receiver of the
property.   To the complaint a demurrer was first inter-
posed, which was overruled, and, after the appointment
of a receiver, the defendants answered.

By their answer, most, if not all, of the material alle-
gations of the complaint were put in issue.   As affirma-
tive matter, it was averred that a contract had been
entered into between the defendants and Bates substan-
tially the same in its terms as the contract already recited,
except that the interest which Bates was to acquire was
an undivided one-third interest, and the further impor-
tant exception that the performance of all of his cove-
nants and agreements was a condition precedent to his
obtaining any interest whatever in the property.   There
are many allegations which charge Bates with misrepre-
sentation, misconduct, fraud and bad faith.   As these
allegations are not sustained by the evidence, they are
not deemed material.   All the material allegations of the
answer were put in issue by the replication.   The trial
was had upon all the issues presented by the pleadings.
A very large part of the testimony was taken prior to the
11th of February, 1886, upon which day George C. Bates
died.

March 23d, by leave of court, an amended complaint
was filed by Mary Barker Bates, as surviving plaintiff,
in her own right, and as widow and only heir at law and
executrix to the last will and testament of George C.
Bates, deceased.   In this complaint the contract alleged
to have been entered into by George C. Bates in his life-
time is set forth in detail.   It is also alleged that, pursu-
ant to said contract, the plaintiff had caused to be pre-
pared an application for patents upon the property, and
presented the same to Alfred H. Wilson, as president of
the corporation, with the request that he duly sign the
same, but he refused so to do.   It is further alleged that

the plaintiff was ready and able to carry out all the terms of the agreement, and ready and willing to pay the amount due McBride, and to obtain the certificate of sale for the use of the company; that the costs of the foreclosure and sale, amounting to $190, had been duly paid.

June 14, 1886, a supplemental complaint was filed by leave of court, in which it is alleged, in substance, that since the filing of the amended complaint the plaintiff had purchased the McBride certificate of sale for the benefit of the defendant corporation. To this supplemental complaint the defendants answered that the said certificate had not been acquired by the said plaintiff, but by Lewis C. Rockwell, her attorney, for the purpose of harassing and oppressing the defendants, etc.

Upon the trial of these several issues it appeared that the plaintiff Mary Barker Bates had, through her attorney, Mr. Rockwell, entered into negotiations with McBride some time prior to April 14, 1886, the day upon which the right to redeem would expire, and that such certificate was actually received by Rockwell on the morning of April 14, 1886; that he then went directly to the residence of Alfred H. Wilson, to inform him that he had received the certificate; that Wilson was not at home, having left the city the night before to go to Park county for the purpose of finding Mr. Burns and redeeming the property from sale; that Wilson did pay to Burns the amount of the decree, judgment and costs; that the master thereafter paid the same into court. Before the conclusion of the trial the certificate was presented to and filed with the court as evidence of the performance of the original contract between the parties. At the time the decree was rendered the situation of the parties seems to have been about as follows: Mrs. Bates had caused the application for patent to be prepared and presented to the defendants to be signed by them as officers of the corporation, but they declined to sign the application. The certificate of purchase had been obtained from

McBride, the amount due him having been paid. The certificate was tendered to the court for the benefit of the parties in interest. The property, from the time the suit was begun until the decree was rendered, had been in the possession of and operated by the receiver. It appears that the net proceeds of the property during the receivership amounted to about the sum of $19,400. By the terms of the decree the bill of complaint was dismissed, the receiver was directed to pay over to Alfred H. Wilson and Randall W. Wilson the sum of $16,000, and to apply the balance to the payment of the costs and expense of the receivership. From this decree this appeal was taken.

In the application of equitable principles to the facts stated, it is necessary, first, to determine the nature of the contract entered into by George C. Bates and Alfred H. Wilson and Randall W. Wilson, and the relations and rights of the parties under that contract. The evidence tends irresistibly to establish the fact that the terms of the contract were settled and agreed upon before or at the time the negotiations with Gwynn and Moynahan, for the purchase of the property, began. The conditions upon which the parties were to join in the enterprise were clearly and well defined. The mutual promises which sustained and supported the agreement were clearly understood. The negotiations for the purchase were to be carried on by Bates. He undertook to acquire the title, vested in Gwynn and Moynahan, together with Gwynn's right to purchase the trust-deed, upon the best terms that could be secured. The Wilsons did not agree to purchase the property upon any terms, but upon terms which might be satisfactory to them. If Bates secured favorable propositions from Gwynn and Moynahan, then the Wilsons, if necessary, were to advance money sufficient to pay the entire purchase price of the property. Having secured the title of Gwynn and Moynahan, it was the duty of Bates, at his

own expense, to perfect that title by foreclosure and sale under the McBride trust-deed, and also to obtain letters patent from the United States.

When the property had been secured, the title was to be held by Alfred H. Wilson and Randall W. Wilson, for the benefit and mutual interest of all concerned. The relation which resulted was in the nature of a mining partnership. That it was so understood by the parties is clear from the evidence of all three, as to the reasons which induced them to form a corporation, to the effect that they sought to avoid liability as partners.

The contract being a valid one, and sustained by sufficient consideration, and having been entered into prior to the purchase, it necessarily follows that, when Gwynn and Moynahan conveyed their title to A. H. and R. W. Wilson, the property was acquired, charged with a trust of which the three parties to the precedent agreement were beneficiaries. The subject of the trust was the property in controversy. The terms of the trust were settled by the contract. The rights of the beneficiaries to participate in the proceeds of the mines were dependent upon the performance of their several undertakings. Before Bates could participate in the proceeds of the property, the defendants were entitled to receive the entire amount of money which they had advanced to pay the purchase price. When that sum had been realized by them, Bates was entitled to be reimbursed for the expenditure made by him in and about obtaining the patents and the satisfaction of the trust-deed. The performance of these undertakings, however, were none of them to be conditions precedent to the acquisition of an interest in the enterprise. If, by the operation of the mines, a sufficient amount was realized to pay the amount advanced by the Wilsons, as cash payments, and the balance of the purchase price as it became due, they were clearly entitled to make that application. If, after the payment of those sums, there remained sufficient of

the net proceeds to pay the expense of obtaining patents and the payment of the McBride trust-deed, then Bates became entitled to such proceeds.  The interests of the parties, after the terms of the contract had been settled and agreed upon, and the property acquired pursuant thereto, were present, and not contingent, interests.  The parties all became beneficiaries by virtue of the contract, as soon as the legal title was acquired.  That this was the legal effect of the contract is manifest.  That it was so understood by the parties is affirmed and emphasized by nearly every written communication which passed between them until the controversy arose which preceded this litigation.  Performance of the several covenants and agreements made by them was not a condition precedent, but a condition subsequent, to the acquisition of an interest in the enterprise.  It was a condition which did not affect the legal title of the parties, but their right to enjoy the equitable interest and benefits of the estate created by the contract.  The agreement was not in the nature of a contract by the Wilsons to sell and convey to Bates an interest in the property.  Bates acquired the interest as soon as the property was purchased pursuant to the contract.  This suit is not in the nature of a suit for specific performance.  On the contrary, it is a suit brought to restrain defendants from interfering with complainants in the enjoyment of the beneficial estate, the right to which sprang into being as soon as the property was acquired.  If Bates was guilty of inequitable conduct, if the complainants failed to discharge the obligations imposed by the contract, the interest was not thereby forfeited.  The defendants could not arbitrarily terminate the trust.  This could be done only by suit, involving an accounting and the settlement and adjustment of the rights of the parties as beneficiaries, as defined by the terms of the contract itself.  If it appeared that a reasonable time had elapsed, and that Bates had failed to perform his contract, or that he had been guilty

of conduct so fraudulent or inequitable as to warrant a forfeiture of his interest, then, by decree, the trust could be terminated, and, but for the conveyance to the corporation, the effect of which will be discussed hereafter, the defendant declared to be vested, not only with the legal title, but with the beneficial estate as well. It is clear that the parties proceeded, under the contract, from December to April, with a clear understanding of their mutual rights and duties.

The next question presented is the effect upon the rights of the parties, resulting from the attempt to organize a corporation. If a body corporate was in fact created, and if by the conveyance of the legal title to that body, which was made by the Wilsons, the corporation actually acquired the property, the effect of that transaction would be clear and unmistakable. The corporation would then have become trustee in place of A. H. and R. W. Wilson. Such is always the relation between a body corporate and its stockholders. The interest of the parties in the capital stock of the company should then have been taken and considered as a substitute for their interest in the body of the property itself. Instead of beneficiaries under a trust, their legal *status* became that of stockholders of a corporation.

First, then, was a body corporate in fact created? This may well be doubted. It is unnecessary to define or discuss the nature of a corporation in this connection. In this state, corporations are organized under the general laws, and are therefore creatures of statute, and can be brought into existence only by substantial compliance with statutory provisions. The statute is in the nature of a general grant of the right to exercise corporate franchises to such persons as may comply with its terms. The certificate of incorporation constitutes the evidence of the acceptance of the terms and conditions contained in the statute. After it has been duly filed, it is the only evidence of the existence of a corporation *de jure*. The

requisites of the certificate are clearly stated in the second section of the statute.   Gen. St. 1883, § 238.

If any one of these statutory requirements is omitted, such omission is a fatal defect, and confers no *de jure* right to exercise corporate franchises.   Tested by this provision of the statute, the certificate in question is clearly insufficient.   Disregarding the omissions, which may be considered as mere irregularities, upon examination it will be found that one of the essential requisites of corporate existence does not appear.   It contains no provision for directors, trustees or any governing body. By its fifth provision the control and management of its affairs are vested in Alfred H. Wilson, president, Randall W. Wilson, vice-president, and George C. Bates, attorney, etc.   These officers can in no sense be regarded as a board of directors.   In all regularly constituted corporations they are elected by and are executive officers of the board of directors or trustees.   The corporation consists of its shareholders.   The control of its affairs is vested in a board of directors.   The shareholders elect this board, except for the first year.   The number of directors and their names for the first year must be inserted in the certificate.   The body corporate can be regularly organized only by and through its directors or trustees.   It is their duty to select the officers, who in this instance are named in the certificate.   This corporation was not regularly organized.   The legal right, therefore, to exercise franchises as a corporation *de jure* was not secured.   If the defendants were in a position to question the validity of the certificate in question, or to challenge the right of the corporation to exercise corporate franchises, or its capacity to take title to property, they might successfully do so.   *Mining Co. v. Herkimer*, 46 Ind. 142; *Reed v. Railroad Co.* 50 Ind. 342; *Harris v. McGregor*, 29 Cal. 124; *People v. Selfridge*, 52 Cal. 331; *State v. Central, etc. Ass'n*, 29 Ohio St. 399; *Abbott v. Refining Co.* 4 Neb. 416; *Stowe v. Flagg*, 72 Ill. 397; *Bigelow v. Gregory*, 73 Ill. 197; *Doyle v. Mizner*, 42 Mich. 332.

But can the defendants be permitted to raise this question? They participated in the organization of this company. They conveyed the property in controversy to the company. For many months they conducted the common business, in the name of and as officers of the company. Until after the institution of this suit, they never questioned its legal existence. Are they not estopped from denying the existence of the body corporate as a corporation *de facto?* This question must be answered in the affirmative. The principles which must control in the determination of this question have already been settled by this court in *Duggan v. Investment Co.* 11 Colo. 113. The following authorities also lay down a like doctrine: *Baker v. Neff*, 73 Ind. 68; *Close v. Glenwood Cemetery*, 107 U. S. 466; *Hasenritter v. Kirchhoffer*, 79 Mo. 239; Tayl. Corp. § 145 *et seq.*

The rule and the reason for it cannot be better stated than in the language of Cooley, J., in *Swartwout v. Railroad Co.* 24 Mich. 389: "It will be seen that the associates, under a statute which authorized them to incorporate themselves, had taken steps for that purpose, had assumed that the purpose was accomplished, and had for some time exercised corporate powers. The defendant was one of their number. He had acted with the rest in laying claim to corporate authority, and he had made payments on the assumption that the claim was well based. * * * The original associates, together with those with whom they became united by the consolidation, were unquestionably a corporation *de facto,* whether they were such *de jure* or not; and, as a corporation in view of the facts in proof, it is reasonable to presume they had contracted debts and incurred obligations. * * * Where there is thus a corporation *de facto,* with no want of legislative power to its due and legal existence; where it is proceeding in performance of corporate functions, and the public are dealing with it on the supposition that it is what it professes to be, and the questions suggested are only whether there has

been exact regularity and strict compliance with the pro-
visions of the law relating to incorporation,— it is plainly
a dictate alike of justice and of public policy that, in
controversies between the *de facto* corporation and those
who have entered into contract relations with it as cor-
porators or otherwise, such questions should not be suf-
fered to be raised."

The principles established by these authorities are
clearly applicable to this case. It necessarily follows that
defendants cannot now question the corporate capacity
of the Woodmas of Alston Mining Company to take
title to the property in controversy, or that the title to
the property is actually vested in that company by the
deed executed by them.

This *de facto* corporation, therefore, became, and is
now, the representative of all the parties. Instead of
being beneficiaries, with an interest in the property, the
parties have become stockholders in the corporation, and
as stockholders their rights are to be determined. The
effect of the declaration of the rights of the parties in
the capital stock contained in the certificate as a contract
need not be determined. The fact that it appears in an
instrument, executed before the body corporate was cre-
ated, is not material. The arrangement was participated
in by the entire constituency of the company. This be-
ing so, it is obligatory upon all parties in interest, and,
having been acted upon by all the members which con-
stituted the corporation, no one of them can be heard to
deny that it is binding upon the corporation itself. The
effect of this declaration, as an item of evidence, is not
so clear. The language used by the parties is as follows:
" The capital stock is $500,000, divided into fifty thousand
shares, of $10 for each share, divided half and half be-
tween the parties." There were three parties, and the ex-
pression, "divided half and half between the parties,"
standing alone and unexplained, is without significance,
unless construed to mean " equally between the parties."

Bates claimed to be entitled to one-half the capital stock. On the other hand, the Wilsons insist that his interest was to be but one-third. In the light of the evidence and all the circumstances of the case, an equal division seems just and equitable, and upon this basis the rights of the parties will be finally determined. For the reasons which have been stated, the parties must be permitted to work out their equities in the property in controversy through the form and by the means of the corporate organization.

This fact, however, is by no means conclusive upon the issues in this case. These remain practically the same. The entire body of the capital stock is substituted in place of the property. If, as has been stated, at the time this suit was instituted, Bates had been guilty of inequitable or fraudulent misconduct; if a reasonable time had elapsed, and complainants had failed to discharge the contract obligations imposed upon them; if, by reason of their omission to institute the necessary proceedings to perfect the title to the property, by securing patents, or through the purchase under the McBride trust-deed, the defendants have sustained injury which cannot be compensated,— then, notwithstanding the organization of a corporation, the declarations as to the division of the capital stock, the subsequent conveyance of the property to the corporation, and the conduct of the parties under the corporate organization, it was still competent for the court to find that the equities were with the defendants, and not with the plaintiffs. No extended discussion of these propositions is necessary. The facts must be considered in connection with the construction which has been given to the original contract between the parties. It was not the duty of the court below to determine the right of complainant to acquire an interest in the property, but her right to enjoy the benefits of an interest already vested. Time was not of the essence of the contract. Performance was not, had not been made,

a condition precedent by the parties. A decree, therefore, which, in effect, forfeited the estate and the beneficial interest of complainant, was inequitable, unless unavoidable. If, in equity and good conscience, a decree could have been rendered defining the rights of the parties, and providing for their enforcement through the corporate organization; if, by an accounting, the interests of all could have been fairly settled without prejudice to the rights of any, or violation of the original contract,— then this course should have been adopted. That such a decree should have been rendered will be clear, upon a brief consideration of the facts.

Bates did not make application for letters patent, as he had agreed to do. It appears, however, that, by an arrangement between the parties, this application was postponed until after the sale under the decree could be had. It further appears that, before the close of the trial, the present complainant, having taken the necessary steps, as must be presumed, presented the application to the defendants, as officers of the company, with the request that the same be executed in order that she, in her own right and as the representative of her deceased husband, might institute proceedings to secure patents in compliance with the contract. The contention of defendants, that the postponement of the application had resulted in expensive litigation, is not sustained by the evidence. On the contrary, it appears, from the testimony of Alfred H. Wilson himself, that adverse claims were expected at the time, or soon after the property was purchased.

Again, at the first sale under the decree of foreclosure, the property was purchased by the Wilsons, as officers of the corporation. The only reason given by Alfred H. Wilson for his failure to complete the purchase, by the payment of the money, is that he believed nothing was due upon the trust-deed, and he wanted time to investigate. It is true that Bates had failed to provide the

money to bid in the property in the manner insisted upon by the Wilsons. He had, however, proposed to purchase it in the name of his client, undertaking to secure the certificate thereafter, for the benefit of the company. How this was to be done could not be questioned by defendants. His interest to secure the benefit of the foreclosure was equal with their own. As officers *de facto* of the corporation, they had the right to redeem, and could not have been prejudiced by the course proposed by Bates, until the equity of redemption had expired. Notwithstanding his failure to provide the sum required, the parties continued their business as before.

Again, at the second sale, Bates proposed to pursue the same course. The right to purchase, either as an individual or as an officer of the company, was clearly open to Wilson. At that time controversy had arisen between the parties, and he was acting under the advice of counsel. Notwithstanding the opportunity to purchase, he permitted Bates to bid in the property in the name of his client, and to take the certificate of sale. Subsequently, and before the trial was completed, the certificate was obtained for the benefit of the company. It is true that the Wilsons redeemed the property from sale by payment of the amount of the decree. This was done by them, however, without any effort on their part to ascertain whether the certificate was or could be obtained for the benefit of the parties in interest. It was also done after this litigation was begun, under the advice of counsel, acting undoubtedly upon the theory that performance of the original contract by complainant was a condition precedent to acquiring any interest in the property; that the corporate organization was fraudulent and illegal, and could be ignored; and that defendants were the owners of the entire property. This theory cannot be adopted by this court. The evidence contained in the record is very voluminous, and seems to extend to every issue which has been discussed, or which is raised by the plead-

ings. . There has been no suggestion in behalf of either party that there is other evidence which should be submitted before the case is finally determined. The form of the decree to be entered by the court below is therefore outlined to some extent by this court.

The judgment of this court is that the decree of the court below be reversed, and that a decree be entered in accordance with the views hereinbefore expressed. Such decree should be so framed as to restrain defendants from interfering with plaintiff in the exercise of her right as a stockholder of the defendant corporation, or from preventing her from making application for patents, in the name of and through the corporate organization, and should require defendants, as officers of that company, to execute all papers necessary in that behalf. It should provide for an accounting between the parties, upon which accounting, among other matters, all sums expended by defendants in the purchase of the property should be allowed, including the amount paid to redeem from the sale under the foreclosure decree; also all sums expended in the operation and development of the property. The amount paid by complainant to secure the certificate of sale should be allowed to her unless already returned. The decree should also provide that, after United States patents have been obtained, all sums necessarily expended by Bates in his life-time in that behalf should be allowed to complainant; that all further sums necessarily expended in obtaining the patents be charged against the interest of complainant; and that, after such accounting, the net proceeds of the property be divided between the parties according to their respective interests in the capital stock of the defendant corporation,— the interest of complainant being one-third, and that of defendants two-thirds; the trial court to make such orders, in respect to the continuance or discharge of any receiver in the action, as the rights and interests of the

several parties and equity and good conscience may require in the premises.

RICHMOND and REED, CC., concur.

PER CURIAM. For the reasons stated in the foregoing opinion the decree is reversed, and the cause remanded for the entry of a decree, and further proceedings in accordance with the views and suggestions therein ex-pressed.

*Reversed.*

CHIEF JUSTICE HELM not sitting.