## No. 11,186.

### WRIGHT *v.* FORSYTH.

Decided February 15, 1926.

Action on account stated.  Judgment for defendant.

## *Reversed.*

1.  ACCOUNT STATED—*Essentials.*  Where a creditor renders an account
    to a debtor which the latter retains a long time without objection, it
    becomes an account stated, and in the absence of fraud or mistake
    is absolutely binding on the debtor.

2.  *Part Payment—Estoppel.*  The receipt by a debtor of a statement
    of account from a creditor, his retention of it without objection, and
    subsequent recognition of his liability by paying a part of it with
    interest thereon, estops him, in the absence of fraud or mistake, to
    be heard with the defense that he was not liable.

3.  TRIAL—*Counterclaim.*  A demand presented by counterclaim is prop-
    erly excluded from the consideration of the jury where there is no
    evidence whatever to support it.

4.  APPEAL AND ERROR—*Pleading—Counterclaim.*  Where no objection is
    made to the action of the trial court in excluding from the consid-
    eration of the jury a demand of defendant set up by counterclaim,
    the matter will not be considered on review.

5.  *Sufficiency of Evidence.*  Where the evidence in a case consists
    wholly of depositions and written exhibits, the Supreme Court may
    analyze and pass upon its sufficiency, and where there is no credible
    evidence to support the judgment, it will be reversed.

*Error to the District Court of Summit County, Hon.
Francis E. Bouck, Judge.*

Messrs. MORRISON & DESOTO, Mr. BENJAMIN GRIFFITH,
Mr. CARL A. KAISER, for plaintiff in error.

Mr. JAMES H. TELLER, Mr. BARNEY S. WHATLEY, Mr. J.
G. SCOTT, for defendant in error.

*En banc.*

MR. JUSTICE CAMPBELL delivered the opinion of the court.

PLAINTIFF Wright brought this action to recover of defendant Thomas A. Forsyth the sum of $2,352.15 on an account stated for moneys that he had advanced and expended and for supplies which he had furnished at the special instance and request of the defendant in and about the working of defendant's Lucky Mining Lode in Summit county. The first defense of the answer is a general denial; the second is that the defendant and his brother John in 1910 owned the Lucky Mine and plaintiff then represented to them that, if they would advance a small amount of money to develop the property, he could open up large bodies of high grade ore and sell the mine at a profit, whereupon an agreement was made with defendants whereby plaintiff was to act as manager for the development of the mine and defendants were to pay costs of operation, and unless and until plaintiff made a sale he was not entitled to compensation for his services as manager; that this arrangement was continued until October, 1912, when, as it is alleged, plaintiff wrote defendant and his brother that he had opened enough ore so that the mine would more than pay expenses and that they need not send any more money; that defendant and his brother thereupon advised and notified plaintiff if he could make the mine pay he might go ahead with the work but they would not put in any more money; after October, 1912, plaintiff, in pursuance of such notice operated the mine at his own risk upon the understanding that plaintiff, and not defendant and his brother, would be responsible for indebtedness incurred; that plaintiff so continued to work the mine of his own accord and at his own risk until April, 1914, during which month the brother died, and thereafter, and until the summer of

1916, when operations at the mine ceased, this defendant, by a third agreement, on his own account advanced to plaintiff money wherewith to further develop the mine, with the further understanding that plaintiff's compensation, if any, was to come out of the proceeds of the sale of the mine. This new matter of the answer was denied by the replication. The entire testimony consists of the depositions of the parties and other witnesses and of exhibits in the form of letters that passed between the parties. At the close of the evidence the court refused the written requests for instructions which were tendered by the plaintiff and submitted the case to the jury upon the court's own instructions and upon the sole issues tendered by the complaint and the first and second defenses of the answer. The verdict was for the defendant and, after plaintiff's motion for new trial was overruled, judgment was rendered dismissing the action at plaintiff's costs, and he is here with his writ of error.

1. A careful reading of this record, including the transcript, convinces us that the judgment was wrong and should be reversed and judgment directed for the plaintiff. Before entering upon the discussion it is well to state that, after the first contract was made, the defendant and his brother, and later the defendant alone, were represented at first by agent Elder and later by agent Hardy and, with the exception of a few letters that passed between the plaintiff and the defendant himself, the entire correspondence on behalf of the defendant was conducted by these agents, but as the agency was recognized by the defendants, for convenience we refer in our opinion to the correspondence as between the plaintiff and defendant himself.

It is admitted, but if it was not the record is entirely clear, that in 1910 defendant and his brother made a contract with the plaintiff which contemplated that the plaintiff would endeavor to sell the mine at a price not less than that fixed by the defendants, and any sum which

might be received in excess of this sum should be regarded as full compensation to plaintiff for his services as manager of the mine in the work and development. The parties themselves first having agreed that it was, if not essential, at least a good business proposition to develop the property in order to make it a more attractive investment for buyers of mining property. It is likewise clear from the record that from the time of beginning work by the plaintiff, soon after what for identification we call the first agreement was made, and until June 6, 1911, defendant continued to remit the amount of the operating expenses in accordance with the bills or vouchers rendered by the plaintiff. Prior to June, 1911, some of the pay rolls were met by proceeds of the sale of ore extracted during the course of development. After June, 1911, and until May 1, 1914, the defendant did not remit any sums whatever to the plaintiff for expense of operation, although the mine was being worked during that time and some money from ore sales was applied on expenses, but the entire cost of operation (which exceeded the amount of sales), less proceeds of sales, was advanced by the plaintiff. While the answer alleges that the so-called first agreement continued only until October, 1912 (and the record shows conclusively remittances thereunder were discontinued in June, 1911), it further alleges that in October, 1912, upon receipt of a letter from the plaintiff that the ores then being extracted and sold would be more than sufficient to pay working expenses and the defendant need not send any more money, the first contract was terminated and a second agreement was made whereby plaintiff was to pay for such costs. The plaintiff's letter on the subject upon which defendant relies as proof of this allegation is not at all what the defendant in his answer alleges. It is merely to the effect that so long as the proceeds of ore sales are sufficient to pay costs of operation, defendant need not make remittances, but it does not say that

the defendant need not thereafter make any further remittances at all; and there is nothing in this or any other letter from which such construction as defendant puts on the language can be inferred.  As is not unusual in mining operations the value of the ores varies from time to time and these parties were aware of that from their own experience with this property, for it soon appeared after this letter was written, and defendant was informed of the fact by the plaintiff, that the value of the ores being taken out had fallen.  Then it was that the plaintiff, to prevent closing down of the property and to accommodate the defendant, advanced the money for further development, and the defendant in a letter acknowledged receipt of plaintiff's proposition, acquiesced therein, and did not question his duty in the premises to repay the plaintiff for these advances.  None of the letters or exhibits contain any suggestions by the defendant to the plaintiff of any change in, or modification of, the first or original agreement and we have diligently examined the record to see if any such is exhibited in this voluminous correspondence.  That is to say, although the defendant alleges in his answer that from October, 1912, a new or second arrangement was made, which lasted until April, 1914, whereby plaintiff instead of defendant was to pay costs of operation, there is no proof whatever of this allegation.  We make this assertion notwithstanding the naked statement in defendant's deposition that he advised and notified the plaintiff to this effect.  Such statement is not borne out, but is proven to be untrue, by the record itself.  Plaintiff and defendant never saw each other from the time of the original deal in Boston, Massachusetts, to which place plaintiff, from his home in Summit county, Colorado, went before the same was made.  If any notice of a change in the contract was given by the defendant or received by the plaintiff, it must have been in writing. There is no such writing in this record.  There is no

claim that the notice was otherwise served or given or that some agent of the defendant gave notice to the plaintiff. It is a significant circumstance that the record is barren of any evidence of notice, and if a second agreement was made which required plaintiff to pay operating costs, that later a third agreement, as defendant himself admits, was made, substantially the same as the first one.

What is conclusive, however, as to defendant's liability for the amount sued for, is that plaintiff rendered a detailed, itemized account of the money he advanced in mine development, including the advances for the period in which the defendant says the second agreement was in force from October, 1912, to April, 1914, and on request of the defendant, plaintiff sent further and more minute statements thereof. Defendant retained each statement without objection that it was inaccurate or that he was not liable to repay the advances. Defendant did not then, as he does now in his answer, disclaim liability for operating expenses between October, 1912, and April, 1914, on the ground that the first agreement had been ended and a second agreement made requiring plaintiff to pay costs of operation. To the contrary, defendant's letters written during and after this period when the so-called second agreement is said to be in force, show his acknowledgement that the statement of expenses had been read by him and that a careful check showed them to be accurate. After defendant received these itemized statements, which showed that the plaintiff had advanced more than $2,600 as operating costs, the defendant wrote plaintiff a letter that he had the matter of reimbursement under consideration, "but just at present he has not the funds available with which to meet your request," and in a letter of December 14, 1915, he writes: "Mr. Forsyth is extremely short of ready money at the present time." He also writes: "That the considerable monthly payments which he has been compelled to make

toward the operation of the Lucky property have been quite a drain on him and these payments have continued for a much longer period than he expected or hoped would be the case, when operations were first begun, and he assumed the expense therefor.'' This letter was written in November, 1915, after the expiration of the period of the so-called second agreement and the letter was written in response to a letter from the plaintiff asking for a remittance to cover plaintiff's advances made during this same period which the defendant in his answer says plaintiff and not he was bound to pay the costs of work. There are other letters of defendant to the same purport. Enough, however, has been said to show conclusively that this account rendered, being thus retained for a long time by the defendant without objection, became an account stated and in the absence of fraud or mistake which is not pleaded here, it is absolutely binding on the defendant. It is only charitable to suggest that when the defendant and his agents in their depositions said that the defendant was not liable on this account for the reasons stated in the answer, they either overlooked or forgot that their own letters written at the time the matter was fresh in their minds flatly and expressly contradict them. We, therefore, cannot receive the mere naked statement of the defendant or the understanding or notion of his agents that the plaintiff, and not the defendant, was to pay costs of operation at anytime during the progress of this work.

The record further shows that in plaintiff's letters to the defendant the former said that he would carry for the defendant the bills due on expense accounts at one time until ''the next shipment of ore,'' and at other times that he would not insist upon payment until he had made further experiments with the sale of ores from time to time. But there is nothing whatever in the record, except the discredited statement in the depositions, which even tends in any degree to show that the plaintiff agreed

or promised or led the defendant to believe that the plaintiff would operate the property at his own risk or pay costs of operation. Reimbursement was expected and demanded by plaintiff for advances and the duty to reimburse was expressly recognized by the defendant in his letters. Not only did the defendant recognize in his letters written to the plaintiff his duty to reimburse, but his subsequent acts and conduct put the question beyond dispute. With full knowledge of the plaintiff's stated account and long after he received and retained the same without objection, and in the month of May, 1916, the defendant remitted to the plaintiff, after repeated demands therefor had been made by the latter, a payment on this account. The letter reads: "Enclosed you will find draft $500 applying on account of the money as paid by you towards the operating expenses of the Lucky Mine." January 16, 1916, defendant, also long after this account was rendered and long after the expiration of the alleged second agreement, sent a draft to the plaintiff for $324.52, being as he said: "The interest at 7 per cent on $2,649.64 (the amount and interest of the stated account) from April 23, 1914, to January 19, 1916. This is the best Mr. Forsyth can do at the present time and we hope that it will tide you over for the present." We do not think the defendant can escape the effect of such a payment. In his deposition, however, and in that of his agents, it is stated that this money was paid under compulsion because of a hard luck story which the plaintiff had set forth in one of his letters about his lack of money to continue the payment of operating expenses. That letter only again urges defendant to repay, as he, plaintiff, needed the money which is due him. Certainly defendant made no such claim in any such letter that appears in this correspondence and the first intimation of a holdup was made in these depositions after the action was brought. Defendant's receipt of the account from the plaintiff, his retention of it without objection,

and subsequent recognition of his liability by paying a part of it and interest upon it, estop him, in the absence of fraud or mistake, which is not pleaded, now to be heard with the defense that he was not liable for these expenses that were incurred between October, 1912, and 1914. He admits his liability for operating expenses during the remainder of the period between 1910 and 1916 when the contract was terminated and work ceased. There was no defense in the answer and no evidence that any fraud was practiced by the plaintiff or any mistake on the part of the defendant when he made payments upon this account and when he recognized his liability by letter.

2. There is another contention by the defendant, which is wholly untenable. His counsel say that after the issues were made up but before trial, the defendant caused to be filed a paper which he denominated a cross-complaint which, in substance, alleges, after reciting the first and second agreements as pleaded in his original answer, that after the death of his brother John and during the month of April, 1914, a third agreement was entered into, substantially the same as the first one, upon assurances by plaintiff that he then claimed to have a purchaser for the property and represented that he was no longer able to operate the mine himself and advance the money for operating expenses, and upon the strength of these representations defendant again promised, as he did originally, to pay the operating expenses in a small way until the mine was sold and then, in case of sale, to reimburse plaintiff for the money the latter claimed he advanced in the period from October, 1912, to April, 1914, out of the surplus, if any, over operating expenses, from sales of ore extracted. In pursuance of such agreement defendant, from time to time after April, 1914, and until some time in the summer of 1916, advanced considerable sums of money to the plaintiff, a large portion of which plaintiff used in exploring and developing adjoining

property of his own, and not for the purpose of exploring and developing defendant's mine. Wherefore he alleged the defendant was thereby damaged by the plaintiff's wrongful conduct in the sum of $5,000, for which he asks judgment. Upon the strength of this cross-complaint or counterclaim, to which he says there was sustaining evidence, defendant now seeks to destroy or overcome the force and effect of the account stated. The evidence, if any, upon which the defendant relies to support his claim for damages, does not appear in this record. In his brief counsel refers to statements or exhibits or offers of evidence which the trial court rejected. However that may be, the trial court did not submit to the jury any such issue as is sought to be raised by this cross-complaint and no objection or exception to the court's rulings was taken or preserved by the defendant. The court submitted the case solely upon the issues raised by the complaint and the first and second defenses of the answer. Defendant's supplemental abstract of the record relating to the subject is not folioed as our rules require. At the end of the counterclaim as reproduced in the printed supplemental abstract there is a notation that at the conclusion of the testimony this counterclaim was withdrawn as a cross-complaint but left to stand as an answer. We are not cited to, and we find nothing in, the transcript of this record so indicating. There seems to be no authority for the notation, but if the notation is correct the trial court properly excluded from consideration of the jury any of the matters set up in this pleading apparently upon the ground that there was no evidence whatever in support of it. As already stated, defendant did not object to the court's ruling and cannot avail himself of anything arising out of this pleading.

It may be that we have expended unnecessary time and labor in investigating this record. It is not a case where this court is assuming merely to resolve a conflict of the evidence in favor of the plaintiff and as against the de-

fendant in whose favor the jury made its finding. The evidence consists wholly of depositions and written exhibits. The jury did not see or hear the witnesses testify in the presence of the court. We are as competent to judge of the weight and sufficiency of the evidence and the credibility of the witnesses as were the trial court and the jury. It is not, however, in a true sense, a matter of conflict in the evidence. There is no credible evidence whatever in support of this verdict and judgment. The case ought never to have gone to the jury. The court should have instructed a verdict for the plaintiff for the amount sued for, as plaintiff's counsel requested. The suit was on an account stated. When it was rendered by the plaintiff and received by the defendant without objection, retained by him for a long time, when he paid a portion of the account and interest on the same with full knowledge of the claim as made, the account is conclusive upon him. It can be impeached only upon the ground of mistake or fraud and no attempt was made to do so. The plaintiff, therefore, was entitled to recover upon the account stated upon any possible theory of the case. For the law of the case see: 1 C. J. p. 689, sec. 271; p. 662, sec. 187; p. 711, sec. 337; *Hurley's Exec. v. Roche,* 6 Fla. 746; *Bates v. Wilson,* 14 Colo. 140, 24 Pac. 99; *Rinderle v. Morse,* 27 Colo. App. 457, 463, 150 Pac. 245.

It was our duty to analyze this evidence and pass upon its sufficiency. We have not the slightest doubt about our conclusion. The judgment is reversed and the cause remanded to the district court with instructions to set it aside, and, in lieu thereof, to render a judgment in favor of the plaintiff for the amount of the account stated, together with appropriate interest thereon, less the payment made on account and a portion of the interest, and for the costs of the action.