## MERRITT *et al. v.* WASSENICH.

*(Circuit Court, D. Colorado. February 27, 1892.)*

1. SPECIFIC PERFORMANCE—DISCRETION OF COURT.
   Specific performance of a contract rests in the discretion of the court, which will not decree it when, in view of all the circumstances, the ends of justice will not be subserved thereby.

2. REAL-ESTATE BROKERS—FALSE REPRESENTATIONS.
   A real-estate agent, in order to induce his non-resident principal to make a sale, wrote that the property might be sold for $27,000, and that this was from $2,000 to $3,000 more than it was worth. A few days later it was sold for $35,000. *Held,* that the statement must be considered a representation of fact, and not of opinion merely.

3. SAME.
   The fact that the owner's son was in the city about a month before, and had written her that the property was worth $35,000, was not sufficient to show that she did not rely upon the agent's representation.

4. SAME—AUTHORITY—DUTY OF THIRD PERSONS.
   One who purchases real estate from a non-resident owner, through a real-estate broker, is bound to ascertain, not only the terms of his authority, but also the correspondence by which such authority was obtained.

In Equity. Suit by Elmer D. Merritt and Philo D. Grommon, copartners, against Theresa Wassenich, for specific performance of a sale of real estate. Bill dismissed.

*Benedict & Phelps* and *J. P. Heisler,* for plaintiffs.

*Charles J. Hughes, Jr.,* for defendant.

RINER, District Judge. This is a suit in equity for the specific performance of a contract for the sale of certain real property situated on Fifteenth street, in the city of Denver, which property is described in the bill of complaint as follows: "Part of lots fifteen and sixteen in block one hundred seven."

The facts, briefly stated, are as follows: January 16, 1888, L. Anfinger & Co., real-estate men at Denver, addressed to the defendant, at Cincinnati, Ohio, the following letter:

"DEAR MADAM: We have some eastern parties here, who are buying Denver real estate, and have been trying to get them to buy your property; but, not knowing what you would sell for, we were unable to give them a price, knowing that the property now pays about six per cent. on a little over $30,-000, with all the risk of a large depreciation in the next few years, for Fifteenth street has seen its best days. In fact, the property was worth more two years ago than it is to-day, and is falling in value every day. The electric road has proved a failure, and the company has stopped running. and all of their operations that have been going on for the past year, trying to make it successful, and have shut down. The tenants of the stores are all kicking, and want a reduction in rent; and we earnestly advise you to sell at the present time, if possible. The people whom we now have on the string will pay

between $27,000 and $30,000, which is from $2,000 to $5,000 more than the property is actually worth, and that much more than you can ever get any one to pay. They say they will only pay $27,000 cash, but we think we can induce them to pay something more. You know Mr. Tesch, the tenant of the saloon, claims that the property is worth more to him than to any one else; still he only offers $25,000. We again advise you that if you can get these people to buy, you ought to let it go. We can loan the money out at 8 and 9 per cent. per annum, secured by first-class Denver real estate, which will give you an income of $200 per month clear, without the trouble, worry, or risk. As it is now, you do not get as much as that, and with the chances of the property depreciating in value. It will never increase, and, as time goes by, it is sure to fall in value. Fifteenth street has had its best days is acknowledged by every one. The town is going the other way. 16th, 17th, and 18th are now the main streets, especially 17th and 18th. If you decide to sell, wire us your very lowest price, (we will get as much more as possible,) for the party will not remain in Denver long enough for you to inform us by mail, and we think we could get more out of them if they are here when your reply comes than by correspondence.

"Yours, very truly,        L. ANFINGER & Co."

To this letter the defendant replied by telegram on the 20th of January, which telegram is in the following language:

"CINCINNATI, OHIO, 20th.
"*To L. Anfinger & Co.*, 1541 *Champa Street:* Thirty-two thousand is my lowest figure.        MRS. T. WASSENICH."

Following this telegram, the defendant wrote to L. Anfinger & Co., her letter being dated on the 20th of January, as follows:

"DEAR SIRS: Your letter of the 16th received, and hardly know what to do. You and Albert and differ so widely in estimate of the property. Albert thinks it worth $35,000, and is positive it will increase in value. As I have the utmost confidence in both, I don't know whose advice to take, so compromised. Still I should not like to miss this chance, and hope you will bring about a settlement. Some years ago was offered $34,000, before even the house was built. They were also eastern people. Should you effect this sale, trust you will make everything solid for us, so they cannot hold us for taxes or anything else. You will remember, perhaps, I made Mr. Tesch a promise through you to let him have the refusal of it, and he might consider himself unjustly treated should we sell without considering that. It might also benefit us to play them against each other, and no doubt he will appreciate it all the more, seeing some one else desires it. However, leave all that to your better judgment. You might let me know what per cent. you charge, also what other expenses will arise, so that I know exactly what to figure on.
"MRS. T. WASSENICH."

Following this correspondence, L. Anfinger & Co. entered into negotiations with one Russell, a resident of Denver and a real-estate broker, for the sale of this property, giving him a certain time within which to close the transaction. He sold it to the complainants herein for the sum of $35,000, and was to receive for his services the sum of $2,000, and on the 28th of January, L. Anfinger & Co. wrote to the defendant, at Cincinnati, Ohio, that they had sold the property for $32,000, less commission and taxes of 1887, stating in their letter that they had used every effort to get the parties up to $32,500, but missed, and stated the terms of sale to be $500 cash, to bind the bargain, $9,500 in 30

days, and $22,000 on or before three years, with interest at 8 per cent., secured by trust-deed on the property; stating, also, to her in that letter that their commission would amount to $715. On the same day they telegraphed her that they had sold the property for $32,000, less commission and taxes. To this last letter and telegram the defendant did not reply, and the only communications from her in relation to this transaction were the letter and telegram of January 20th. On the 28th of January, the date of the last communication to Mrs. Wassenich, L. Anfinger & Co. signed a receipt, as follows:

"DENVER, COLO., Jan. 28, 1888.

"Received from Merritt & Grommon, as part payment for the following described real estate, [here follows description,] the entire price to be paid for said real estate $32,000, and is to be paid as follows: $1,000 as above recited; $9,000 on or before thirty days from date; and four notes, of $5,500 each, aggregating $22,000, secured by trust-deed on said property. The four notes payable on or before three years from said date, with interest at eight per cent. per annum, interest payable quarterly. The title to be perfect, a good and sufficient warranty deed, and to be executed and delivered by said Theresa Wassenich to Merritt & Grommon, their heirs or assigns, on or before the 28th of February, 1888, together with an abstract showing clear title: provided, however, that the payment of $31,000 is tendered or paid at said date. If the said payment of $31,000 in cash and notes is not paid or tendered on or before the said 28th of February, 1888, then this contract to be void and of no effect, and both parties released from their obligations herein; and in that event the said one thousand dollars paid on this date is to be held by Theresa Wassenich and L. Anfinger & Co. and P. B. Russell, brokers, one-half each, as liquidated damages.

[Signed]                     "THERESA WASSENICH.
                        "By L. ANFINGER & Co., her Agents.

"Witnesses:
    "P. B. RUSSELL.
    "W. B. WHITE."

Subsequently, and on the 8th of February, L. Anfinger & Co. gave to the complainants herein the following receipt:

"DENVER, COLO., Feb. 8, 1888.

"Received of Merritt & Grommon the sum of five hundred dollars, as part payment of lots fifteen and sixteen, in block one hundred seven, in East Denver, Arapahoe county, Colorado, described as follows, [here follows description,] which I have this day assigned to said Merritt & Grommon at the full price of $32,000, the balance of $31,500 to be paid upon examination of title and at the time or times, and in the manner, as I may then see fit to request.

[Signed]                     "MRS. THERESA WASSENICH.
                "By L. ANFINGER & COMPANY, her Agents."

—This last receipt or contract being the one set out in the bill of complaint, and which the court is asked to specifically enforce.

The above constitutes substantially all of the correspondence in the transaction between these parties and Mrs. Wassenich in relation to the sale.

It is contended by the complainant that if any misstatements were contained in the communication of L. Anfinger & Co. of January 16th

which led up to the alleged sale by them, as the agents of Mrs. Wassenich, of this property, they related merely to matters of opinion, and were not misstatements or misrepresentations of fact, and that the plaintiffs are only charged with knowledge of this correspondence so far as it relates to the question of authority.

It is contended, also, that she had other means of information, and that she knew the situation when she sent the telegram and letter of January 20th. The relief here asked is not a matter of absolute right to either party. It is a matter resting in the discretion of the court, to be exercised upon a consideration of all of the circumstances of the particular case. The discretion which may be exercised is not an arbitrary or capricious one, but is controlled by the established doctrines and settled principles of equity. In general, relief will be granted when it is apparent from a view of all the circumstances of the case the ends of justice will be subserved, and it will be withheld when from a like view it appears that it will produce hardship and injustice to either of the parties. It is not sufficient to show that the legal obligation under the contract to do the specific thing desired may be perfect, but it must also appear that the specific enforcement will work no hardship or injustice. That L. Anfinger & Co.'s letter of January 16th contained misstatements, and misstatements of fact, and not of mere opinion, is I think undoubted. Their statement was not, in my judgment, a statement of opinion merely. They were real-estate men, and assumed to state the facts. Their statement to the defendant was that the property could probably be sold for $27,000, which was $2,000 or $3,000 more than it was worth. That this statement was not the fact, and that it must, or at least should, have been known to them to be unwarranted, is I think fully established by the fact that within a very few days the property found ready sale at $35,000.

Neither do I think that there is anything in the suggestion that she had other sources of information; that her son had been there, and that for that reason she did not rely upon the statement of L. Anfinger & Co. The evidence shows that her son had left Denver, and gone to California, a month or two before this transaction. I think it apparent on the face of this record that the letter of January 20th was written to induce her to close the transaction at what is clearly shown to be an inadequate price. Taking the entire correspondence, and the circumstances surrounding the transaction, into consideration, I think it entirely clear that the effect was to commit a fraud upon her, and induce her to part with her property for less than it was worth; and I do not think it can be said, in view of the fact that L. Anfinger & Co. were in the real-estate business, and had opportunity to know the values of property, that their statement contained in the communication which was the basis of this transaction was a mere expression of opinion. But, conceding this to be the fact, still I say they were bound to know. So far as the transaction affects the rights of the defendant in this case, the misrepresentations were misrepresentations of fact, upon which she relied, and which induced her replies which are now relied on as the

basis of recovery here. Whether Merritt & Grommon knew the contents of the letter of L. Anfinger & Co. of January 20th is perhaps not clearly shown by the record; but, if they did not take steps to inform themselves as to that matter, they cannot take advantage of it here, for they were bound to know, not only the authority from her to L. Anfinger & Co., but the correspondence which induced that authority to be given. But, even taking the most favorable view for the complainant in the case, and admitting, for the sake of argument, that the misstatement in the letter of the 20th was only an expression of opinion as to values, and that Merritt & Grommon were not required to examine into the transaction further than to see the authority, still this contract is one which I think, within all the cases, cannot be specifically enforced. Construing the authority in the most favorable light, and giving to it the broadest construction contended for by complainant, its terms were not complied with. The authority was, if authority at all, to sell the property for $32,000; the purchaser to be responsible for the taxes. The sale as made was for $32,000,—five hundred dollars cash, $9,500 in 30 days, and $22,-000 in three years; the defendant to pay the taxes on the property and a commission of $715. This was the statement of sale contained in the letter of L. Anfinger & Co. of January 28th; also the statement of the sale contained in the receipt given by them on that date. That authority to make the sale upon such terms was not authorized, the parties themselves it seems became aware; for on the 8th of February another and different receipt, stating different terms of sale as to payment, was given by L. Anfinger & Co. to the complainants. That this last transaction was unauthorized, and cannot affect the rights of this defendant, I think entirely clear. The terms of sale as originally made she declined to accept, and they could not after that date, without new authority, proceed to make other and different terms of sale.

In addition to all that I have suggested above, my own view is that the authority on which L. Anfinger & Co. assumed to act was not an authority to sell the property for $32,000. The very language of the letter shows clearly upon its face that it was not intended as an authority to dispose of the property at that price, absolutely and unconditionally, but that it contemplated further correspondence and negotiations. The closing words of her letter are: "You might let me know what per cent. you charge, also what other expenses will arise, so I will know exactly what to figure on." This statement meant, if it meant anything, that the matter must be again submitted to her before any definite action was taken.

Under all of the circumstances of this case, to grant the relief asked by the complainants would undoubtedly work a great hardship and injustice upon this defendant; it would be to say to her that she must take for her property several thousand dollars less than it was worth at the time of the transaction, and this upon a letter and telegram which she was induced to write by a statement of values, which, so far as she is concerned, under the circumstances of this case, amounted to a fraud.

The complainants' bill will be dismissed, at their cost.