[No. 4164.]

### RINDERLE ET AL. *v.* MORSE.

1. APPEAL AND ERROR—*Depositions—Effect.* Where the evidence is by deposition the court of review has the same opportunity to judge of its weight as the court below. A decree manifestly inequitable, and against the weight of the evidence, reversed. (463.)

2. SPECIFIC PERFORMANCE—*Discretionary.* In general specific performance will be granted, only when, in view of all the circumstances, it is manifest that justice will be subserved. It is not sufficient to show a perfect legal obligation to perform the contract relied upon. It must also appear that specific performance will work no hardship nor injustice. (465, 466.)

The evidence examined and the contract appearing to have been obtained by wilful misrepresentation of fact, and to involve serious loss to defendant, a decree directing specific performance was reversed. (466,467.)

*Error to Mesa District Court.* HON. CHARLES CAVENDER, Judge.

Mr. N. C. MILLER and Mr. HENRY TUPPER for plaintiffs in error.

Messrs. BURGESS & KINARD and Messrs. BULLOCK & WALKER for defendant in error.

BELL, J.

E. P. Morse, hereinafter called plaintiff, seeks to enforce against Charles Rinderle and Sophia Rinderle, his wife, hereinafter called defendants, a specific performance of the following contract, to-wit:

"Whitewater, Colo., March 9, 1912.

"This contract entered into this 9th day of March between Chas. Rinderle and Sophia Rinderle and E. P. Morse.

"E. P. Morse trades Mr. Rinderle 160 acres in Douglas Co., Mo., free of all incumbrance, and is to receive the SE¼ SW¼ SE¼ Sec. 14, Twp. 2 S. of R. 1 E. Ute M., NW¼ NW¼ SE¼ Sec. 14, Twp. 2 S., R. 1 E., Ute M., Twp. 2 S. of R. 1 E., Ute M., 20 acres, more or less, also all the equipment, household and kitchen furniture, together with all water rights clear of incumbrance, with abstract and taxes up to date.

"Morse is to furnish abstract and taxes up to date.

"Charles Rinderle.

"Sophia Rinderle.

"Deeds to change March 21, 1912.

"E. P. Morse.

"Anna Morse."

This contract is incorporated in and forms the basis of the complaint. The answer alleges the value of defendants' property mentioned in said contract at $6,000, and sets up as a defense to the action that defendants were induced to enter into said contract by the false and fraudulent representations made by and on behalf of the plaintiff, whereby, in signing said contract, they believed to be true, among

other things, that plaintiff's land mentioned in said contract was well worth the sum of $6,000. These matters were denied, and put in issue by the replication, and after a trial to the court without a jury, a decree was entered in favor of the plaintiff as prayed for.

It appears from the record that defendants, at the time of the trial, had been living at Whitewater, Colo., upon their lands described in the complaint, for a period of 20 years, and were then living there with their family of 6 children. Being desirous of trading or selling their property, so as to change their location in order to be closer to a catholic church and school, wherein they could have their children instructed in the principles of their faith, they made known their desires to a Mr. Leonard Downing, who subsequently learned from a Mr. Alfred Meyers, plaintiff's brother-in-law, who resided at Fruita, Colo., as did also the plaintiff, that a trade might be effected for plaintiff's farm of 160 acres in Missouri. Downing then arranged a meeting between defendants and Meyers, at which a trade of the properties was first discussed between them, and after informing plaintiff of the prospective trade, Meyers investigated defendants' property at plaintiff's suggestion, conducted practically all of the negotiations on the part of the plaintiff in the matter of the proposed trade, prepared the contract in suit for execution, secured the signatures of the parties thereto, and was plaintiff's principal witness at the trial.

The evidence clearly shows beyond dispute that defendants' purpose in desiring a trade or sale of their premises was to locate closer to a Catholic church, they then being 17 miles distant from the church with which they were affiliated. They testified that Myers represented to them that there was a Catholic church at Burnham, Mo., and that Burnham was only about 8 miles from plaintiff's property, with a good level road leading thereto; that the nearest post office to the property was a half mile therefrom; that the premises were under good fence, and contained from 70 to 80 acres of

bottom land, with soil from 6 to 8 feet deep, two sets of buildings in good condition, a good new barn and outbuildings, an orchard of 100 Elberta peach trees, and 100 apple trees, all in good bearing, some valuable timber, and a spring that could be conducted to the house at a cost of about $10; that a quarter of the crop raised on the land during the year 1911 amounted to between $300 and $400; and that the property was worth $6,000, and every dollar of it, so much so that plaintiff would not consent to pay any commission on the trade.

They also testified that they were opposed to signing the contract until after they had made an investigation of the property, but that Meyers insisted upon them signing it, saying "it is simply to show my brother-in-law you intend to trade, because he might trade the place to somebody else if I have nothing to show," and assuring them if conditions were not as represented by him the properties could be traded back any time within 3 months, 6 months or a year.

Rinderle testified that Meyers promised to furnish him with the nearest post office address, and a description of plaintiff's property when he returned the copy of the contract signed by plaintiff; that, after waiting several days for this description, and failing to receive the same, he became uneasy and called to see plaintiff in regard thereto at his home; that Morse was absent when he called, and upon inquiring of Mrs. Morse, he learned from her that Burnham was 12 or 13 miles from the Missouri property, and that there was no Catholic church at that place, but that there was one at Willow Springs, 17 miles from the farm; that he was surprised upon receiving this information, and upon his return home, he wrote plaintiff, among other things, as follows:

"I told Mr. A. S. Myers that one of my main objects in trading is to get nearer to a Catholic church, and Mr. Myers told me positive that there is a Catholic church at Burnham, and Burnham is only (8) eight miles from your

place, but I found out today that there is no Catholic church at Burnham and it is 12 miles from your place. I am sorry that this has went so far. It has put me out a great deal, the same as you, but if Mr. Myers would have told me the truth about the distance to church, I would never have talked about trading."

This letter was written March 12, 1912, only 3 days after the contract was signed, and while the facts of the transaction were fresh in the memories of the parties.

He also testified that after further conferences, he executed a deed for his premises, and on March 21st, 1912, when the deeds were to be exchanged, he left it with a Mr. Marsh, pending a further investigation of plaintiff's property, which he desired to make. Up to this time plaintiff had not secured an abstract to his property as required by the contract, and the property was encumbered by a mortgage, which he was arranging to satisfy when the trade should be completed. In the course of his further investigation, Rinderle wrote the tenant of the Missouri property, informing him that he had purchased the property, and consenting to the tenant's occupation of the premises for the remainder of the season. He also inquired of him as to the condition of the farm, and as to its distance from Willow Springs, and whether or not there was a Catholic church at this last named place. Prior to a tender by plaintiff of an abstract to his property, or a performance on his part of the material conditions of the contract, Rinderle, in reply to his inquiries, learned from the tenant that the property was located 12 miles from Burnham; that it might sell for from twelve to fifteen hundred dollars; that the rent for the year 1911 amounted to but $55; and that part of the land was wet, and the soil of the balance very thin. As a result of this, with other, information, defendants were fully satisfied of the falsity of the representations made by and on behalf of the plaintiff, and refused to permit the deed to be delivered, or to proceed further with the trade.

Both Meyers and plaintiff denied that they made any representations other than such as were contained in an alleged written description of the Missouri property, which was received in evidence on behalf of the plaintiff, and which Meyers testified he delivered to Mr. Rinderle, who read and returned it to him before the contract was signed. Both defendants, however, denied that they ever read or received such a description, and swore that Meyers pretended to read from a paper, which he represented to be a written description, and immediately returned it to his pocket. The paper offered and received in evidence contained only general statements that could have been applied to almost any farm of the same size, and of almost any value, and has all the appearances of a self-serving instrument; for it is a significant fact that while it was supposed to have been prepared by plaintiff for the use and benefit of the defendants, and given to Meyers to be delivered to them, it nevertheless, was returned by Myers to Morse, who thereafter retained possession of it.

It is shown that plaintiff well knew the condition of his property, and refused to reside on it after having visited and inspected it for that purpose. This knowledge on his part is a fairly good indication that the value of $6,000 placed upon it by him, according to his own and Meyers' testimony, and so represented to defendants by Meyers, was very much inflated and well calculated to deceive. The undisputed depositions of defendants' four witnesses in Missouri show beyond question that the property at its highest value was not worth more than one-fifth of the value placed upon it by the plaintiff. All of those witnesses had lived on or about the property, were well acquainted therewith for 20 years and upwards, did not know either of the defendants, and were not interested in the result of the controversy. They all valued the land itself at only $800, and one of them, who had lived on the premises, valued the land with fences, buildings and appurtenances at $1,000, and another, who

was county clerk of the county in which the property was located, and had lived in the vicinity of the property practically all of his life, valued both the land with its fences, buildings and appurtenances at $1,200 or $1,300 which was the highest value placed upon it by any of the witnesses, all of whom swore that the farm consisted of about 80 or 90 acres of bottom land, with soil from 3 to 5 inches deep, and the balance in upland, very hilly, rocky and rough, and not capable of cultivation; that the farm contained only a few peach and apple trees, and very little or no marketable timber, and was enclosed by a patched up, decayed fence, which was in a bad state of repair; that the buildings on the land were small and rough, and mostly in a bad state of repair; that the property was from 11 to 14 miles from Burnham, and the road leading thereto, for a distance of 3 miles, was very rough, hilly and rocky; that there was no Catholic church at Burnham, and none closer to the property than 18 or 20 miles; and that the nearest postoffice to the farm was a distance of 2 miles.

This testimony appears by depositions, as does also that of Mr. Downing, and, of course, this court has the same opportunity to judge of its weight as the trial court had. The trial court, however, seems to have entirely overlooked the depositions, and the principles of equity in its consideration of the case, as its principal findings, and the decree entered, appear to be based largely upon a strict application of legal rules to the disputed evidence offered by and on behalf of the plaintiff. In its findings of facts, the trial court said: "This may or may not be an advantageous contract for the defendant. There is no evidence in the case as I recall of any value being placed on the Whitewater property."

If it were necessary for the defendants to establish the value of their property, which we do not concede, and need not decide, we think there is ample evidence in the record to show that it was of a much greater value than

that of plaintiff's, and that the contract sought to be enforced is manifestly unfair in view of plaintiff's knowledge of the condition of his property and the excessive valuation placed thereon by him. Downing, who was instrumental on behalf of the defendants in bringing about the proposed trade, and who was present at most of the negotiations between the parties, fully corroborated the defendants in the matter of the representations alleged to have been made by Meyers and the plaintiff. As before stated, his testimony appears by deposition, and in them he swore, among other things, that plaintiff assured Mr. Rinderle that the Missouri property was as Meyers stated it to be, and that he could not afford to pay a commission on the trade, as his farm was worth $6,000, but that later he agreed to give Downing 10 stands of bees, that were on the Rinderle ranch, as his commission for his assistance in negotiating the trade. He also swore that the Rinderle ranch consisted of 20 acres with full water rights, and that the equipment on the ranch, which was included in the contract, was worth $1,000, and that the value Rinderle placed on his ranch was $5,000.

Here is positive and undisputed evidence in itself that the personal effects alone of the defendants were worth fully the value of plaintiff's entire property, as placed upon it by one of the witnesses, and within two or three hundred dollars of the highest value placed upon it by any of the witnesses, other than the plaintiff himself. It is apparent, therefore, that plaintiff's property was valued by him at least five times higher than its greatest possible worth as testified to by disinterested witnesses who were familiar with its condition and location, and that under a specific enforcement of the contract, defendants would be required to surrender a 20-acre farm with full water rights, of such substantial value at least as to support a thousand-dollar equipment, together with the equipment itself, for a farm worth not more than defendants' equipment alone, and which could

not answer the purpose for which a trade was desired by them.

Nothwithstanding this direct evidence, it is elementary, as is well stated in *Merritt v. Wassenich,* (C.C) 49 Fed., 785, 788, and recognized in many other authorities, too numerous to mention, that

"The relief here asked (specific performance), is not a matter of absolute right to either party. It is a matter resting in the discretion of the court, *to be exercised upon a consideration of all the circumstances of the particular case.* The discretion which may be exercised is not an arbitrary or capricious one, but is controlled by the established doctrines and settled principles of equity. In general relief will be granted when it is apparent *from a view of all the circumstances* of the case the ends of justice will be subserved, *and it will be withheld when from a like view it appears that it will produce hardship and injustice to either of the parties. It is not sufficient to show that the legal obligation under the contract to do the specific thing desired may be perfect, but it must also appear that the specific enforcement will work no hardship or injustice."* (Italics are mine.)

The origin and ground of equity jurisdiction in cases of specific performance arises from the fact that a compensation in damages is inadequate, and a specific performance should not be decreed unless the agreement has been entered into with a reasonable fairness without material misapprehension, misrepresentation or oppression: *Frisby et al. v. Ballance et al.,* 4 Scam. (Ill.), 287, 299, 39 Am. Dec. 409.

In Pomeroy on Contracts, 2nd Ed., sec. 175, page 244, it is said:

"The principle, that he who comes into the court seeking equity—that is, seeking to obtain an equitable remedy—must himself do equity, means not only that the complainant must stand in conscientious relations towards his adversary, and that the transaction from which his claim arises must be fair and just in its terms, but also, that the

relief obtained must not be oppressive nor hard upon the defendant, and must be so shaped and modified as to recognize, protect, and enforce all *his* rights arising from the same subject-matter, as well as those belonging to the plaintiff. By virtue of this principle, the specific performance of a contract will be refused when the plaintiff has obtained the agreement by sharp and unscrupulous practices, by overreaching, *by non-disclosure* of important facts, by trickery, *by taking undue advantage of* his position, or by any other means which are unconscientious; and when the contract itself is unfair, one-sided, unjust, unconscionable, or affected by any other such inequitable feature, or when the enforcement itself would be oppressive or hard upon the defendant, or would prevent the enjoyment by him of his own rights, or would in any other manner work injustice."

The principle, that he who seeks equity must do equity, applies with full force to the facts attending the case at bar. The plaintiff had every advantage in executing the contract, and every reason to desire its enforcement. He was familiar with both properties, while defendants resided in Colorado, far removed from plaintiff's property in Missouri, and depended entirely upon the veracity and honesty of their informers as to its location, condition and value. With these advantages, plaintiff failed to make known to defendants the material facts of which he had knowledge, and which, when brought to their attention, caused them to revoke the contract. Further, according to Downing's depositions, Meyers—of whom the trial court said in its findings of facts "seems to have been somewhat of a trader"—admitted to him that he had a hard time in having the defendants sign the contract, and stated that "he had them tied up all right," and Mr. Berry, defendants' counsel and receiver at the U. S. Land Office at Montrose, testified that when he told Meyers that gross misrepresentations had been made about the Missouri land, the roads, the church, and other things, he, Meyers, interrupted and said "Yes, but he (Rinderle)

signed the contract; that has nothing to do with it; it ain't in the contract," all of which Mr. Berry testified he noted at the time it was said.

It is not probable that a man, having the purposes that defendants had, would contract for the trade of a 20-acre farm, with full water rights and a thousand-dollar equipment, for a property such as plaintiff's on the meagre representations contained in the written description hereinbefore mentioned, notwithstanding the testimony of Meyers and the plaintiff to the contrary; and in view of the facts and strong circumstances herein pointed out, it is hardly necessary to further review the evidence to show that the trial court erred in overlooking or failing to properly consider material undisputed evidence on behalf of the defendants, and that its decree is contrary to the weight of the evidence and the principles of equity.

Therefore, the decree should be, and is, hereby reversed.

*Reversed.*

Decided July 6, A. D. 1915. Rehearing denied July 23, A. D. 1915.